THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
EUSEBIO GÓMEZ MORENO, Defendant and Appellant.

No. 8339.   Argued December 6, 1940.—Decided December 12, 1940.

*Juan Lastra* for appellant.   *George A. Malcolm, Attorney General, and R. A. Gómez, Prosecuting Attorney,* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

A criminal complaint was filed in the Municipal Court of San Juan, Second Section, against Eusebio Gómez Moreno charging that on January 8, 1939, he did unlawfully, wilfully, and maliciously, fire, from the steamer "Coloradan," docked at pier No. 6 of the Bull Insular Line in the port of San Juan, P. R., several revolver shots with the intent to wound E. Fernández Betancourt, Rafael Collazo Moraza, Félix Duclós, and José Rodríguez Jiménez, who were in a yawl. He was also charged with carrying a prohibited weapon.

Upon being sentenced by the municipal court, he appealed to the district court where after a joint trial *de novo* covering both cases, held pursuant to a stipulation of the parties with the approval of the court, he was sentenced to pay a fine of $50 for the assault, and to one month's imprisonment in jail for the carrying of the weapon. He then appealed to this court, urging that the trial court erred in the reception of the evidence and in the weighing thereof.

The evidence of the district attorney consisted in the testimony of three of the persons claimed to have been assaulted—Duclós, Fernández Betancourt, and Collazo Moraza—of Iluminado Torres, an insular policeman, and Ricardo Cátala, and that of the defense in the testimony of Luis Reyes, Rafael Monge, and the defendant Gómez Moreno.

In arguing the two errors assigned which relate to the weighing of the evidence, the appellant maintains that the evidence for the prosecution fails to show with the necessary clearness and certainty that it was he who fired the shots, or in any event, that he did so with the intent to harm any person; or that he carried a revolver.

After an examination of said evidence we find, that the witness Duclós, Fernández Betancourt, and Collazo Moraza stated that while they were in a boat, when passing near the steamer "Coloradan," they heard some shots and saw the defendant fire his revolver at them from the steamer, for

which reason some of them jumped into the water and the other lay down on the bottom of the boat.

To use their own words, which we transcribe from the testimony of one of them: ". . . we heard a shot and I looked to see where the shot had come from, and I saw this man (the defendant) with a revolver in his hand shooting at us ... . and we had to jump into the water to avoid the bullets . . . . he was firing the shots from the stern of the steamer 'Coloradan' . . . through a porthole . . . and I saw him when he was running on deck with the revolver.''

We also find that the policeman Torres stated:

"On that day I was standing on the corner of pier No. 6; we were watching that pier because at that time there was a strike of the 'U. T. M.' and of another Laborers' Association directed by Mr. Eusebio G. Moreno. Mr. Ramón Boria and I were at the corner next to the steamer 'Coloradan,' which was loading, with our backs turned towards the stern of the steamer, and we heard two shots and when the first two shots sounded we turned about because we thought that they were intended for us, and we looked in front and we saw that three more shots were fired, and we saw that the bullet sprinkled a yawl, and some individuals were in the yawl; then they jumped off the yawl, and we went on board the steamer, and when we went there, Mr. Eusebio Moreno was coming, quite nervous, down the steamer's grangplank and I stopped him and arrested him. Then they all cried out: 'Eusebio Moreno did it.' Then when I arrested him . . . . he said 'Let me go down' and I told him: 'No sir, you are under arrest,' and then we brought him to San Juan to the finger-print section.''

The above evidence, which was believed by the trial judge, seems to us to be sufficient. It is not improbable and shows the assault by the defendant with a firearm and with the intent, coupled with the present ability, to commit a violent injury on the person of another, which is what the law (section 232 of the Penal Code, 1937 ed.) requires in order that the crime charged—assault—may be regarded as having been committed. It is likewise sufficient as to the carrying of the prohibited weapon, which constitutes a separate offense, in

accordance with the law and the repeated jurisprudence of this court.

Regarding the second error which is attributed to the court and which relates to the evidence, it will suffice to say that the admission on the part of .the district attorney, as to the fact that the defendant carried no weapon when he went on board the steamer, has not the scope attributed to it by the appellant, as we shall see presently.

According to the record, the following incident occurred: The defendant was testifying and he was asked by his attorney whether he had been searched before he went on board the steamer. He answered in the affirmative, that he was searched by Marcial Torres, a watchman on the steamer. The defense requested an opportunity to subpoena the watchman and the court ordered the marshal to summon him. Then the defense stated: ''The district attorney offers to admit . . . . that those searches were made . . . and that Marcial Torres searched the defendant.'' And the district attorney said: ''I admit that, but Marcial Torres can not guarantee that there were no weapons on board the steamer.''

It is from that admission that the appellant infers that the district attorney was bound to prove the origin of the revolver with the carrying of which the defendant was charged, and that, as he failed to do so, both the charge of assault and that of carrying a prohibited weapon must collapse.

By the third and last of the errors assigned it is maintained that the defendant was deprived of a fundamental right when he was precluded from asking the witnesses for the prosecution as. to the motive they had for testifying against him.

Turning to the record we find that the defense extensively cross-examined the witness for the prosecution, Ricardo Cátala, as to whether the persons who were in the boat belonged to any labor union different from and adverse to that of the defendant, and he elicited the answers that the

witness was the secretary of the union which included among its members Fernández Betancourt, Collazo Moraza and Duclós, who on the day of the occurrence "were holding a picket line"; that the defendant was not a member of his union, but of the "I.L.A."; and that work continued on the "Coloradan" notwithstanding the protest against it made by his union.

At that stage of the cross-examination the following incident occurred:

"Q. And, as secretary, do you know whether that pleased your union, that work should continue there?—A. No, sir.—District Attorney: I object.—Judge: The objection of the prosecution is sustained.—Defense: Please note, your honor, that those persons who have come to testify as witnesses are members of the union which was on strike at that time; he is the secretary; he states that he was in contact with them, that he was calling them; he knows what they were doing; he also knows that the defendant at that time was on the 'Coloradan' and work was continued on the 'Coloradan'; that the object of a picket is to stop the work, and that it was their mission to interrupt that work which was contrary to their strike;...and we think that it is relevant to ask whether those workmen were affected by the fact that they were on board the steamer on that day jointly with other persons who were working on board the steamer. In no other way would it be possible to prove the interest of those witnesses, or the interest of a witness to testify in a given case regarding a material fact, in order to judge of the credibility of the evidence.—Judge: The court sustains the objection of the district attorney.—...Defense: We take an exception."

The evidence for the prosecution went on and similar questions were insistently asked and were answered without objection. The evidence for the defense was then introduced. The defendant himself testified extensively along the same line and his witness Rafael Monge stated:

"On that day we had a strike on the docks, the two organizations were in disagreement, the 'I.L.A.' and the 'American Federation of Labor,' and that day the company, Don Carlos Ball, called Mr. Moreno in order to supply personnel for unloading the steamer 'Coloradan' on January 8, 1939, and Mr. Moreno came on board to

talk to the engineer and to the captain. . . . 1 went on board to confer with Moreno, because the unloading of the steamer depended upon him and myself . . . and I talked to him again about furnishing more personnel and I again went on shore . . . and at that moment Mr. Moreno, who was coming down the gangplank, was arrested by the officer Iluminado Torres.''

From what we have transcribed above, and more in detail from the whole of the transcript of record, it may be seen that despite the refusal of the judge, the defendant in point of fact succeeded in introducing all of the evidence he desired on the fact that the witnesses for the prosecution Duclós, Fernández Betancourt, and Collazo Moraza belonged to a labor union which opposed his, both unions being in disagreement as to whether or not the steamer ''Coloradan'' should be unloaded; and that therefore the defendant suffered no prejudice.

Moreover, when the question was objected to by the district attorney, it had already been answered by the witness and everything that was said or decided subsequently was without any basis. However, granting to the exception taken all its force, and conceding the existence of an open strife between workmen belonging to·different unions, and of hostile witnesses on that account, said hostility might serve to justify the court in cautiously receiving their testimony, but not necessarily compel it to reject such testimony as unworthy of credit. It believed the same, and no showing has been made to us that its finding was erroneous. On the contrary, the very hostility relied on gives strength to the truth of the charge.

The appeals must be overruled and the judgments appealed from affirmed.